IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02597-PAB-MEH

RAJEEV KUMAR, M.D.,

      Plaintiff,

v.

COPPER MOUNTAIN, INC.,

      Defendant.

_____

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITH PREJUDICE

_____

This state-law negligence case comes before the Court on defendant Copper Mountain, Inc.'s motion for summary judgment [Docket No. 32].  The Court's jurisdiction is proper under 28 U.S.C. § 1332(a) based on the existence of diversity of citizenship and an amount in controversy over $75,000.

## I.  BACKGROUND

### A.  Factual Background

On March 16, 2006, plaintiff Dr. Rajeev Kumar, while an experienced skier, was skiing at Copper Mountain ski resort for the first time.  Pl.'s Br. in Opp'n to Def.'s Mot. and Br. for Sum. J. Pursuant to Fed. R. Civ. P. 56(c) [Docket No. 56] ("Pl.'s Resp.") at 9, ¶ 50; Reply in Supp. of Mot. and Br. for Sum. J. Pursuant to Fed. R. Civ. P. 56(c) [Docket No. 65] ("Def.'s Reply") at 4.  At one point that afternoon, Dr. Kumar was skiing downhill on a portion of the ski area known as Union Peak.  Dr. Kumar was skiing in an area where an "intermediate" run called Timber Ridge converged with two "expert" runs

known as Retreat and Gold Digger which were located directly to the west.[1]  Pl.'s Resp.

at 3 ¶ 19, 9 ¶ 51; Def.'s Reply at 2 ¶ 19; 4 ¶ 51.  Somewhere in that vicinity, a portion of

the mountain drops steeply in what is widely referred to as "Celebrity Cornice."  *See*

Mot. and Br. for Sum. J. Pursuant to Fed. R. Civ. P. 56(c) [Docket No. 32] ("Def.'s Mot.

for Sum. J.") at 3 ¶ 18; Pl.'s Resp. at 3 ¶ 18; Def.'s Reply at 2 ¶ 18.  As Dr. Kumar

approached Celebrity Cornice he apparently did not see the edge of the drop-off.  Pl.'s

Resp. at 9 ¶ 55; Def.'s Reply at 5 ¶ 55.  Dr. Kumar skied off of Celebrity Cornice and

was airborne for approximately two seconds as he fell several feet to the ground below.

Pl.'s Resp. at 10 ¶ 60; Def.'s Reply at 5 ¶ 60.  Dr. Kumar claims that he suffered serious

injuries from the fall.

---

[1] The designation of individual trails as "expert" or "intermediate" derives from the Ski Safety Act of 1979's command that

> [a] sign shall be placed in such a position as to be recognizable as a sign to skiers proceeding to the uphill loading point of each base area lift depicting and explaining signs and symbols which the skier may encounter at the ski area as follows:
>
> (a) The ski area's least difficult trails and slopes, designated by a green circle and the word "easiest";
>
> (b) The ski area's most difficult trails and slopes, designated by a black diamond and the words "most difficult";
>
> (c) The ski area's trails and slopes which have a degree of difficulty that falls between the green circle and the black diamond designation, designated by a blue square and the words "more difficult."

Colo. Rev. Stat. Ann. § 33-44-107(2) (West 2009).  Copper Mountain's labeling system designates its "more difficult" trails and slopes as "intermediate" and its "most difficult" trails and slopes as "expert."  *See* Mot. and Br. for Sum. J. Pursuant to Fed. R. Civ. P. 56(c) [Docket No. 32], ex. A-2 (conventionally filed map of ski area).

Although many Copper Mountain employees knew of Celebrity Cornice and where it was located, it was not depicted or marked on the trail map that was provided to guests of the ski area.  *See* Pl.'s Resp. at 6 ¶ 36, 7 ¶ 39; Def.'s Reply. at 4 ¶ 36, 4 at 39.  Furthermore, it is not clear from the record how Celebrity Cornice was marked on the mountain itself such that said markings might warn approaching skiers of its presence.  *See*, *e.g.*, Pl.'s Resp. at 6 ¶ 33, 9 ¶ 53, 9 ¶ 55, 10 ¶ 59, 11 ¶ 61; Def.'s Reply at 5 ¶ 53, 5 ¶ 55, 5 ¶ 59.  It is undisputed, however, that Celebrity Cornice and the trails on which it was located were not marked as either "extreme terrain" or "freestyle terrain."  *See* Def.'s Mot. for Sum. J. at 11; Pl.'s Resp. at 13, 14-15.  Furthermore, there is nothing in the record suggesting that Copper Mountain placed any signage on the mountain itself which identified Celebrity Cornice by name at the location of the feature.  Instead, "Celebrity Cornice" appears to be the name adopted by skiers and ski patrol personnel to describe this feature.  *See* Pl.'s Resp. at 12 ("[T]he feature 'gained its name from guests skiing off the cornice in an effort to impress friends or others . . . .' Even longtime Copper Mountain Ski Patrol Director Chuck Tolton acknowledges that the Cornice is 'named for what it is, people jumping off and kind of going for greatness . . . .'" (citing Exhibit 1, Tolton Dep., 68:15-69:5)).

## B.  Procedural Background

On December 13, 2007, Dr. Kumar filed a complaint with this Court asserting a claim against Copper Mountain for negligence and negligence per se.  The claim alleges that Copper Mountain breached both statutory and common law duties to Dr.

3

Kumar by failing to post adequate signage in the vicinity of Celebrity Cornice.  Dr. Kumar contends that Colorado's Ski Safety Act of 1979 and its amendments (the "Act") required Copper Mountain to mark the area of Celebrity Cornice as "extreme terrain" or "freestyle terrain" and that common law duties required Copper Mountain to "post caution signs pursuant to its standard operating procedures, warning skiers of the existence and danger of the Celebrity Cornice."  Compl. and Jury Demand [Docket No. 1] ¶ 15.

Defendant Copper Mountain filed the motion for summary judgment which is presently before the Court.  *See* Def.'s Mot. for Sum. J.  Plaintiff Dr. Kumar filed a response.  *See* Pl.'s Resp.  Defendant filed a reply in support of its motion for summary judgment.  *See* Def.'s Reply.  Thus, Copper Mountain's motion for summary judgment is fully briefed and ripe for review.

## II.  ANALYSIS

### A.  Summary Judgment – Legal Standard

According to Federal Rule of Civil Procedure 56(c), a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).  However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead

a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119

F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

A court may not consider all proffered evidence when ruling on a summary

judgment motion; only admissible evidence may enter the analysis. *See World of*

*Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  When viewing

the permissible evidence, courts are to make reasonable inferences therefrom in the

light most favorable to the nonmoving party. *Byers v. City of Albuquerque*, 150 F.3d

1271, 1274 (10th Cir. 1998).

### B.  Liability of Ski Area Operators Under Colorado Statutes

The Act limits the liability of ski area operators for injuries suffered by skiers at

ski areas in the state of Colorado.[2]  According to the Act,

> [n]otwithstanding any judicial decision or any other law or statute to the
> contrary, including but not limited to sections 13-21-111 and 13-21-111.7,
> C.R.S., no skier may make any claim against or recover from any ski area
> operator for injury resulting from any of the inherent dangers and risks of
> skiing.

---

[2] As the terms are used in the Act, "'[s]ki area' means all ski slopes or trails and
all other places within the ski area boundary, marked in accordance with section
33-44-107(6), under the control of a ski area operator and administered as a single
enterprise within this state"; "'[s]ki area operator' means an 'area operator' as defined in
section 25-5-702(1), C.R.S., and any person, partnership, corporation, or other
commercial entity having operational responsibility for any ski areas, including an
agency of this state or a political subdivision thereof"; and "'[s]kier' means any person
using a ski area for the purpose of skiing, which includes, without limitation, sliding
downhill or jumping on snow or ice on skis, a toboggan, a sled, a tube, a snowbike, a
snowboard, or any other device; or for the purpose of using any of the facilities of the
ski area, including but not limited to ski slopes and trails."  Colo. Rev. Stat. Ann. §§ 33-
44-103(6)-(8) (West 2009).  The parties in this case agree that at the time in question
Copper Mountain ski resort was a "ski area," defendant Copper Mountain was a "ski
area operator," and plaintiff Dr. Kumar was a "skier."

Colo. Rev. Stat. Ann. § 33-44-112 (West 2009).  The Act defines "the inherent dangers and risks of skiing" broadly as

> those dangers or conditions that are part of the sport of skiing, including changing weather conditions; snow conditions as they exist or may change, such as ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions with such natural objects; impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components; variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads, freestyle terrain, jumps, and catwalks or other terrain modifications; collisions with other skiers; and the failure of skiers to ski within their own abilities.

Colo. Rev. Stat. Ann. § 33-44-103(3.5) (West 2009).

The Colorado General Assembly has not fully immunized ski area operators from liability, however.  Not only may ski area operators be liable for injuries caused by something other than an inherent danger or risk of skiing, but the Act limits the definition of "inherent dangers and risks of skiing" by excluding "the negligence of a ski area operator as set forth in section 33-44-104(2)" from this definition.  Colo. Rev. Stat. Ann. § 33-44-103(3.5) (West 2009).  Section 33-44-104(2) states that

> [a] violation by a ski area operator of any requirement of [the Act] or any rule or regulation promulgated by the passenger tramway safety board pursuant to section 25-5-704(1)(a), C.R.S., shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of such operator.

Colo. Rev. Stat. Ann. § 33-44-104(2) (West 2009).

The Act imposes various specific requirements on ski area operators.  For example,

> ski area operators must maintain a sign system, including signs indicating the level of difficulty of the area's slopes and trails, notices that warn of danger areas, closed trails, and ski area boundaries, and the marking of man-made structures that are not readily visible to skiers.  They must undertake safety precautions related to the operation of equipment such as snowmobiles and motorized snow-grooming vehicles on slopes and trails within ski area boundaries.[3]

*Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 74 (Colo. 1998) (internal citations omitted); *see also* Colo. Rev. Stat. Ann. §§ 33-44-106, 107, 108, 110 (West 2009).  A ski area operator's breach of these or any other of the listed duties constitutes a violation of the Act and, to the extent that such a violation causes injury, the breach constitutes actionable negligence.  *See Bayer*, 960 P.2d at 74.

Thus, under the statutory scheme of the Act, there are two ways a ski area operator may be liable for a skier's injuries: first, the skier is injured as a result of the negligence of the ski area operator with respect to something that is not an inherent danger or risk of skiing; second, the skier is injured as a result of the ski area operator's failure to comply with the Act.

As a result, there are two steps in assessing a ski area operator's liability to an injured skier: 1) determine whether the ski area operator violated the Act; and 2) determine whether the cause of the injury otherwise falls outside the definition of the

---

[3] The requirement that ski area operators post notices that warn of danger areas was removed by an amendment in 2004.  *Compare* Colo. Rev. Stat. Ann. §§ 33-44-107(2)(d) (West 2003) ("A sign shall be placed in such a position as to be recognizable as a sign to skiers proceeding to the uphill loading point of each base area lift depicting and explaining signs and symbols which the skier may encounter at the ski area as follows . . . Danger areas, designated by a red exclamation point inside a yellow triangle with a red band around the triangle and the word 'Danger' printed beneath the emblem. Danger areas do not include areas presenting inherent dangers and risks of skiing."), *with* Colo. Rev. Stat. Ann. §§ 33-44-107 (West 2009).

"inherent dangers and risks of skiing."  *See Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202, 1213 (10th Cir. 2001).

### 1. Violation of the Act

Dr. Kumar contends that Copper Mountain violated the Act by failing to properly mark the portion of the ski area known as "Celebrity Cornice" as either "extreme terrain" or "freestyle terrain."  While both "extreme terrain" and "freestyle terrain" are explicitly included within the definition of "inherent dangers and risks of skiing," failure to identify these types of terrain with signage violates the Act.  *See* Colo. Rev. Stat. Ann. § 33-44-107(2)(d) (West 2009) ("The ski area's extreme terrain shall be signed at the commonly used access designated with two black diamonds containing the letters 'E' in one and 'X' in the other in white and the words 'extreme terrain'.  The ski area's specified freestyle terrain areas shall be designated with an orange oval."); Colo. Rev. Stat. Ann. § 33-44-107(5) ("The ski area operator shall place a sign at or near the beginning of each trail or slope, which sign shall contain the appropriate symbol of the relative degree of difficulty of that particular trail or slope as set forth by subsection (2) of this section.").

### a. Celebrity Cornice as "Extreme Terrain"

The Act defines "extreme terrain" as "any place within the ski area boundary that contains cliffs with a minimum twenty-foot rise over a fifteen-foot run, and slopes with a minimum fifty-degree average pitch over a one-hundred-foot run."  Colo. Rev. Stat. Ann. § 33-44-103(3.1) (West 2009).  In interpreting a statute under Colorado law, a court's "primary task is to ascertain and give effect to the intent of the legislature in enacting

9

them." *See People v. Triantos*, 55 P.3d 131, 134 (Colo. 2002).  Where a statute

defines a term, that definition controls.  *See* Colo. Rev. Stat. Ann. § 2-4-101 (West

2009) ("Words and phrases that have acquired a technical or particular meaning,

whether by legislative definition or otherwise, shall be construed accordingly.").  To the

extent that terms in the definition are not defined in the statute, courts are to give the

terms their plain or commonly accepted meaning.  *See Slack v. Farmers Ins. Exch.*, 5

P.3d 280, 284 (Colo. 2000).  Thus, "[w]hen the language is unambiguous and the

legislative intent reasonably clear, we need not resort to other rules of statutory

construction."  *Triantos*, 55 P.3d at 134.

With respect to the statutory definition of "extreme terrain" the terms are

unambiguous and the legislative intent is reasonably clear.  There are only two

circumstances under which a steeply descending portion of a ski area may qualify as

"extreme terrain."  Under the first, there must be a twenty-foot drop in elevation over a

fifteen-foot lateral span.  Under the second, there must be an average pitch of fifty

degrees over a one-hundred-foot lateral span.

The parties agree that "[t]he slope comprising Celebrity Cornice does not meet

the minimum fifty-degree average pitch over a one-hundred foot run criterion to satisfy

the statutory definition of 'Extreme Terrain.'"  Def.'s Mot. for Sum. J. at 4 ¶ 24; *see also*

Pl.'s Resp. 4 ¶ 24.  Therefore, Celebrity Cornice will qualify as "extreme terrain" only if it

is a "cliff with a minimum twenty-foot rise over a fifteen-foot run."  Failure to establish

that Celebrity Cornice amounted to a twenty-feet decline over a lateral distance of

fifteen feet equates to a failure to establish that Celebrity Cornice was "extreme terrain."

Although the parties disagree about what constitutes a "cliff" for purposes of the definition of "extreme terrain," the more important issue is the height of Celebrity Cornice.  The evidence shows that Celebrity Cornice did not meet the twenty-foot height requirement.  The only evidence that even suggests the possibility that Celebrity Cornice was twenty feet in height is plaintiff's contested report that Christopher Scherr, the ski patrolman who first attended to Dr. Kumar, estimated that the fall had been between fifteen and twenty feet.  *Compare* Pl.'s Resp. at 5 ¶ 28, 10 ¶ 59, *with* Def.'s Reply at 3 ¶ 28.  Every other source, including plaintiff's own expert, indicates that the height of Celebrity Cornice did not reach the twenty-foot threshold.  *See* Def.'s Mot. for Sum. J. at 5 ¶ 28, ex. A5 at 4 (internal pagination: 75:15-16); Pl.'s Resp. at 5 ¶ 28 (citing ex. 5, 146:1-10), 11 ¶¶ 62-63; Pl.'s Notice of Filing of Signed Aff. of Stan Gale [Docket No. 57], ex. 1 (Aff. of Stan Gale) at 2 ¶¶ 6, 8; Def.'s Reply at 5 ¶¶ 62-63; *see also* Def.'s Mot. for Sum. J., ex. A6 at 3 ¶ 5(c).  Therefore, the undisputed facts show that Copper Mountain was not required to mark Celebrity Cornice as "extreme terrain" and its failure to do so did not violate the Act.

### b.  Celebrity Cornice as "Freestyle Terrain"

As for Dr. Kumar's claim that Copper Mountain violated the Act by failing to mark Celebrity Cornice as "freestyle terrain," I look first to the statute's definition of the term. According to the Act, "'[f]reestyle terrain' includes, but is not limited to, terrain parks and terrain park features such as jumps, rails, fun boxes, and all other constructed and natural features, half-pipes, quarter-pipes, and freestyle-bump terrain."  Colo. Rev. Stat. Ann. § 33-44-103(3.3) (West 2009).

The guiding principle in interpreting a statute is that the intent of the legislature be given effect.  *Slack v. Farmers Ins. Exch*, 5 P.3d 280, 284 (Colo. 2000).  As discussed above, "[t]o discern that intent, we afford the statutory language its ordinary and common meaning, giving effect to every term and provision, including legislative definitions, while harmonizing potentially conflicting provisions, if possible."  *Normandin v. People*, 91 P.3d 383, 386 (Colo. 2004) (internal quotation marks omitted).  However, "[w]here a statutory word or phrase, not defined by the legislature, has no plain meaning or is reasonably susceptible to multiple meanings, we are faced with an ambiguity and must explore extrinsic aids to construction."  *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 599 (Colo. 2005).

Turning first to the ambiguity question, I find that the General Assembly's definition of "freestyle terrain" in section 33-44-103(3.3) is ambiguous.  In its broadest sense "freestyle terrain" can mean any tract of land which could be used to engage in freestyle activity.  However, the General Assembly signaled its intent to confine the meaning of the term to a smaller category of land.  Unfortunately, it is unclear from the face of the definition what exactly those confines are.

Because the General Assembly chose to define the phrase by way of example rather than by providing discrete conceptual parameters, the interpreter of the statute must extrapolate a complete understanding of the phrase from what has been provided.  As an additional challenge, the list itself contains a confusing array of commas and conjunctions which make it difficult to reach a coherent, comprehensive understanding of the term based solely on the words of the definition.  Finally, by prefacing its

12

description of "freestyle terrain" with the qualification that such definition "includes, but is not limited to" the listed examples, the Colorado General Assembly provided a definition that is by its very terms incomplete.  The effect is that the term "freestyle terrain" is susceptible to more than one reasonable meaning.  Therefore, it is ambiguous and the Court must consult interpretive aids in determining the General Assembly's intent.

I begin the analysis by considering the list which the General Assembly provides in the definition of "freestyle terrain."  The Colorado Supreme Court has remarked that "[o]ften the best guide to legislative intent is the context in which the statutory provisions appear and any accompanying statement of legislative policy, such as a legislative declaration."  *Stamp v. Vail Corp.*, 172 P.3d 437, 443 (Colo. 2007).  Here, I look to contextual cues from the section itself, as well as the statute as a whole in determining the legislative intent behind the definition of "freestyle terrain."

The specifically listed items – terrain parks, terrain park features, jumps, rails, fun boxes, half-pipes, quarter-pipes, and freestyle-bump terrain – all connote features that have some level of purposeful design, construction, or arrangement.  To the extent, as Dr. Kumar contends, that any one of these listed items could be defined more broadly, I find that the doctrine of *noscitur a sociis* draws it back.  *Cf. Currier v. Sutherland*, --- P.3d ----, 2009 WL 3337683, at *7 (Colo. 2009) (Eid, J., concurring in part) ("Under the canon of construction noscitur a sociis, a word is known by the company it keeps." (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 694 (1995)) (internal quotation marks omitted)); *see also Bedford v. Johnson*, 78 P.2d 373, 376 (Colo. 1938) (under "the legal doctrine of noscitur a sociis . . . the meaning of a

13

doubtful word may be ascertained by reference to the meaning of words associated with it").  Therefore, because the overwhelming thrust of the listed items is that the features must be purposely designed, constructed, or arranged in order facilitate freestyle skiing, the doctrine of *noscitur a sociis* prevents any one item from being interpreted differently.

The General Assembly's inclusion of the phrase "and all other constructed and natural features" in the definition of "freestyle terrain" does not undermine the Court's interpretation.  Again, the doctrine of *noscitur a sociis* suggests that any natural features either be part of a constructed feature or be included in a design or arrangement that is intended to facilitate freestyle skiing.  The interpretive maxim of *ejusdem generis* also supports this construction.  Under *ejusdem generis*, where "words of general import follow specific designations, the application of the general language is controlled by the specific."  *Bedford*, 78 P.2d at 376; *see Winter v. People*, 126 P.3d 192, 195 (Colo. 2006) ("[W]here a general term follows a list of things in a statute . . . the general terms are applied only to those things of the same general kind or class as those specifically mentioned.").  Therefore, because features which accord with the Court's interpretation precede the phrase "and all other constructed and natural features," this general phrase should be read to comport with that same interpretation.  The Court's conclusion is further supported by the fact that the phrase bears a close connection in the definition to the terms "terrain parks" and "terrain park features," terms which strongly suggest purposeful design, construction, and/or arrangement.

In addressing the entire definition of "freestyle terrain," the Court must contend with the potentially expansive prefatory language, "includes, but is not limited to . . . ."

14

Generally, the word "include" signifies extension or enlargement beyond what is explicitly stated. *See Lyman v. Town of Bow Mar*, 533 P.2d 1129, 1133 (Colo. 1975). The addition of the phrase "but is not limited to" reinforces that reading. However, there is some indication from the Colorado Court of Appeals that the phrase "includes, but is not limited to" requires that any item outside of those listed must be analogous to the listed items. *See Benuishis v. Indus. Claim Appeals Office*, 195 P.3d 1142, 1145-46 (Colo. App. 2008); *see also Free Speech Def. Comm. v. Thomas*, 80 P.3d 935, 937-38 (Colo. App. 2003). Indeed, as the Court in *Benuishis* holds, the doctrine of *noscitur a sociis* discussed above strongly suggests such an outcome. Therefore, although the prefatory clause in the definition of "freestyle terrain" enlarges the scope of the term, it only enlarges it by adding like features, features which are purposely designed, constructed, or arranged in order to facilitate freestyle skiing.

The Court's interpretation of the phrase "freestyle terrain" also comports with the general legislative scheme of the Act and prevents an otherwise absurd result. As the Colorado Supreme Court has stated, in order to effectuate legislative intent, the Court must consider the statute as a whole, giving consistent, harmonious, and sensible effect to all its parts and furthering the legislative intent represented by the entire statutory scheme. *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000).

Here, if "freestyle terrain" included all portions of a ski area which skiers may utilize to engage in some level of freestyle skiing regardless of whether that terrain was purposely designed, constructed, or arranged for that use, then that the term could encompass nearly the entire ski area. The typical ski resort has a large number of

natural features that a skier could use in order to engage in freestyle activity.  If all of the areas with these features qualified as freestyle terrain, then under § 33-44-107(2)(d) a ski area operator potentially could be required to mark the great majority of the ski area as "freestyle terrain."  Such an interpretation would lead to an absurd result.

Not only are courts encouraged to consider the consequences of a particular construction, *see* Colo. Rev. Stat. Ann. § 2-4-203 (West 2009), they are to avoid statutory constructions which lead to absurd, unreasonable, or infeasible results.  *See State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000) ("[I]n construing a statute, we must seek to avoid an interpretation that leads to an absurd result."); *see also* Colo. Rev. Stat. Ann. § 2-4-201 (West 2009) ("In enacting a statute, it is presumed that: . . . [a] just and reasonable result is intended; [a] result feasible of execution is intended . . . .").

Dr. Kumar's proposed interpretation also is untenable in light of the General Assembly's stated goals in passing and amending the Act.  Perhaps the best evidence of the legislature's intent behind the Act is found in the legislative declaration contained in the Act itself.   *Cf.* Colo. Rev. Stat. Ann. § 2-4-203 (West 2009) ("If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider among other matters . . . [t]he legislative declaration or purpose."); *Stamp*, 172 P.3d at 443.  The Act's legislative declaration explains:

> The general assembly hereby finds and declares that it is in the interest of the state of Colorado to establish reasonable safety standards for the operation of ski areas and for the skiers using them. Realizing the dangers that inhere in the sport of skiing, regardless of any and all reasonable safety measures which can be employed, the purpose of this article is to supplement the passenger tramway safety provisions of part 7 of article 5 of title 25, C.R.S.; to further define the legal responsibilities of ski area operators and their agents and employees; to define the

16

responsibilities of skiers using such ski areas; and to define the rights and
liabilities existing between the skier and the ski area operator and
between skiers.

Colo. Rev. Stat. Ann. § 33-44-102 (West 2009). This statement evinces two competing

goals. First, the Act is intended to benefit skiers by ensuring a certain minimal level of

safety at ski areas. Indeed, the Act is entitled the "Ski Safety Act of 1979." *See* Colo.

Rev. Stat. Ann. § 33-44-101 (West 2009); *cf. People v. Hernandez*, 160 P.3d 263, 264

(Colo. App. 2007) ("Although not dispositive, we may also consider the title of a statute

in construing the statute's meaning."). For example, the Act requires ski area operators

to provide skiers with notice of certain hazards and permits ski area operators to

remove careless or reckless skiers. *See* Colo. Rev. Stat. Ann. §§ 33-44-106, 107, 108,

110 (West 2009).

The second goal at play in the Act is the General Assembly's desire to define

and limit the duties and attendant liability of ski area operators. This intent is evinced

by the Act's delineating, often with great specificity, the duties of ski area operators,

*see*, *e.g.*, Colo. Rev. Stat. Ann. §§ 33-44-106, 107, 108, 110 (West 2009), and

simultaneously eliminating liability for injuries resulting from the inherent dangers and

risks of skiing. *See* Colo. Rev. Stat. Ann. § 33-44-112 (West 2009).

Both of these goals are served by the Court's interpretation of the term "freestyle

terrain." On one hand, skiers will be notified of the existence of, and be able to avoid

the dangers associated with, those areas which ski area operators design, construct,

and arrange for freestyle skiing. On the other hand, ski area operators know which

areas must be marked. They also know that, if they comply with the marking

17

requirement, they will not be liable for injuries which result from skiers skiing on this terrain.

Conversely, both of these results would be undermined if "freestyle terrain" were interpreted to include all portions of a ski area which skiers utilize to engage in some level of freestyle skiing regardless of whether that terrain was purposely designed, constructed, or arranged for that use. Ski area operators would not have any degree of certainty regarding which areas must be marked. In response and out of an abundance of caution, ski area operators would be motivated to mark vast swaths of their ski areas as "freestyle terrain." In turn, because so much of the mountain would require marking, skiers would be unable to distinguish areas posing substantial hazards from those that include a single unintended, natural feature which someone may use to freestyle ski, thus undermining the safety benefits derived from the marking requirement.

Therefore, upon consultation of the interpretive aids discussed above, I conclude that the General Assembly intended the term "freestyle terrain" to encompass only those features which are purposely designed, constructed, or arranged so as to facilitate freestyle skiing.[4] Conversely, a feature that is merely used by skiers to engage in freestyle activity, but is not designed, constructed, or arranged for such activity, is not "freestyle terrain."

---

[4] Pursuant to the Act, "skiing . . . includes, without limitation, sliding downhill or jumping on snow or ice on skis, a toboggan, a sled, a tube, a snowbike, a snowboard, or any other device . . . ." Colo. Rev. Stat. Ann. § 33-44-103(8).

In applying the Court's interpretation of "freestyle terrain" to the present case and Celebrity Cornice, I conclude that Celebrity Cornice is not "freestyle terrain" as specified by the Act.

The parties agree that Celebrity Cornice is not analogous to most of the specific features listed in the Act's definition of "freestyle terrain."  *See* Def.'s Mot. for Sum. J. at 5 ¶¶ 30-31; Pl.'s Resp. at 5 ¶¶ 30-31.  However, Dr. Kumar believes that Celebrity Cornice is properly considered either a jump or a natural quarter-pipe and, thus, must be marked by an orange oval pursuant to § 33-44-107(2)(d).  *See* Pl.'s Resp. at 5 ¶ 31, 12-13 & n.2.  Copper Mountain, on the other hand, believes that "freestyle terrain" encompasses only those jumps, quarter-pipes, and other terrain park features that are located within terrain parks.  Def.'s Reply at 3-4 ¶ 31, 6-7.  Ultimately, I am not convinced by either party's arguments.  Instead, I find dispositive the fact that there is no evidence that Celebrity Cornice was purposely designed, constructed, or arranged to facilitate freestyle skiing.

The parties agree that Celebrity Cornice was formed by natural forces, i.e. blowing snow in conjunction with the underlying topography.  *See* Def.'s Mot. for Sum. J. at 5 ¶ 27; Pl.'s Resp. at 4 ¶ 27; Def.'s Reply at 3 ¶ 27.  They also appear to agree that individual skiers regularly jump off of it.  However, neither party suggests that it was purposely built or incorporated into an area intended to facilitate freestyle skiing. Because it was not purposely designed, constructed, or arranged to facilitate freestyle skiing, Celebrity Cornice cannot qualify as a jump, a quarter-pipe, or any other feature as they are contemplated in the Act's use of the term "freestyle terrain."

As a result, defendant Copper Mountain has met its burden at the summary judgment stage by identifying a lack of evidence supporting Dr. Kumar's negligence per se claim based on the Act's requirement that "extreme terrain" and "freestyle terrain" be marked. Specifically, Copper Mountain has established that no reasonable jury could find, based on the evidence on record, that Celebrity Cornice fits within the statutory definition of either "extreme terrain" or "freestyle terrain." Plaintiff, for his part, has not met the shifting burden in establishing, at a minimum, an inference of the presence of these essential elements of his negligence per se claim. Therefore, Copper Mountain is entitled to summary judgment on Dr. Kumar's claim that the defendant violated the Act, and thus committed negligence, by failing to mark the area in and around Celebrity Cornice as "extreme terrain" or "freestyle terrain."

### 2.  Dangers and Risks That Are Not Inherent to Skiing

Although Dr. Kumar has failed to show that Copper Mountain was negligent per se by violating the Act, the ski area operator still may be liable if Dr. Kumar's injuries were caused by something other than an inherent danger or risk of skiing. However, if Celebrity Cornice constitutes a feature posing an inherent danger or risk of skiing, the Act shields Copper Mountain from liability. *See* Colo. Rev. Stat. Ann. § 33-44-112 (West 2009).

Celebrity Cornice is a steep decline on a ski slope or trail. According to the General Assembly, inherent dangers and risks of skiing are "those dangers or conditions that are part of the sport of skiing." Colo. Rev. Stat. Ann. § 33-44-103(3.5). The definition provides two particularly relevant examples of inherent dangers: "surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds,

20

cliffs, extreme terrain, and trees, or other natural objects" and "variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads, freestyle terrain, jumps, and catwalks or other terrain modifications."  Colo. Rev. Stat. Ann. § 33-44-103(3.5) (West 2009).

Celebrity Cornice could fit within either of these examples.  In fact, the only reasonable conclusion under the Act is that Celebrity Cornice is an inherent danger or risk of skiing.  The Act specifically identifies "extreme terrain" with its more precipitous characteristics as such a danger or risk.  It would be illogical for Celebrity Cornice, with its less severe characteristics, to fall outside the category of inherent dangers and risks of skiing.

### C.  Liability of Ski Area Operators Outside of the Act

#### 1.  General Premises Liability Under Colorado Law

Dr. Kumar also alleges that Copper Mountain is guilty of negligence for breaching the common law duty to warn and for breaching a duty imposed by the assumed duty doctrine.  According to Dr. Kumar, the common law duty requiring property owners to warn invitees and licensees of known dangers requires ski area operators to post warning signs in addition to those dictated by the Act.  Dr. Kumar also argues that, because Copper Mountain marked certain dangers on the mountain with caution signs, it "assumed a duty" that it must carry out with reasonable diligence.  Specifically, Dr. Kumar contends that Copper Mountain's alleged failure to mark Celebrity Cornice with caution signs breached an assumed duty to warn of all such dangers.  Dr. Kumar claims that this alleged breach caused his injuries and, as a result, Copper Mountain may be held liable.  Copper Mountain does not deny that such duties

exist under Colorado law generally.   However, it believes that the Act abrogated these duties with respect to ski area operators and their guests.

In Colorado, a "landowner" has a duty to warn invitees and licensees of certain dangers extant on the property.[5]   *See* Colo. Rev. Stat. Ann. § 13-21-115(3)(b)-(c) (West 2009); *Vigil v. Franklin*, 103 P.3d 322, 326 (Colo. 2004).   Failure to do so exposes the landowner to liability.   *See* Colo. Rev. Stat. Ann. § 13-21-115(3) (West 2009); *Vigil*, 103 P.3d at 326.   However, contrary to Dr. Kumar's assertions, this duty, rather than being based in common law, is founded in Colorado's premises liability statute.[6]   *See* Colo. Rev. Stat. Ann. § 13-21-115 (West 2009).   In fact, the Colorado Supreme Court has held that the premises liability statute completely abrogates the common law when it comes to premises liability.   *See Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004) (citing Colo. Rev. Stat. Ann. § 13-21-115(2) (West 2009)).

---

[5] A "landowner," as the term is used in this discussion, "includes, without limitation, an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property."   Colo. Rev. Stat. Ann. § 13-21-115(1) (West 2009); *see also Wark v. United States*, 269 F.3d 1185, 1188 (10th Cir. 2001).   For purposes of the present case, Copper Mountain qualifies as either a person in possession of the real property at issue or as a person legally responsible for the condition of that property or for the activities conducted or circumstances existing on that property.

[6] In fact, prior to 1971, a similar regime to that in the statute was in place under the common law.   However, a landowner's common law duty to warn was altered by the Colorado Supreme Court in 1971.   *See Mile High Fence Co. v. Radovich*, 489 P.2d 308, 314 (1971).   It then was reinstated by the General Assembly in 1987, *see* Colo. Rev. Stat. Ann. § 13-21-115 (1987), only to be struck down as unconstitutional in 1989, *see Gallegos v. Phipps*, 779 P.2d 856, 862-63 (Colo. 1989).   In 1990, the General Assembly passed the present premises liability statute, which remains in effect today. *See* Colo. Rev. Stat. Ann. § 13-21-115 (West 2009).

Colorado also has adopted the "assumed duty" doctrine, which holds that "[w]here a person represents by word or act that he has done or will do something upon the performance of which he should realize that others will rely, he is liable for expectable harm caused by the reliance of others and his failure of performance, if his representation was negligently or intentionally false, or if without excuse he fails to perform." *Lester v. Marshall*, 352 P.2d 786, 791 (1960); *see Jefferson County Sch. Dist. R-1 v. Justus ex rel Justus*, 725 P.2d 767, 770-71 (Colo. 1986) (adopting Restatement (Second) of Torts § 323 (1965)); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 64-65 (1955) ("[I]t is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner."). However, no Colorado court appears to have addressed the specific question of whether the premises liability statute abrogates assumed duties to warn along with other common law duties. I conclude that logic dictates that it does so abrogate.

One factor supporting this conclusion is the Colorado Supreme Court's ruling in *Vigil* that the abrogation of common duties and defenses by § 13-21-115 is expansive. *Vigil*, 103 P.3d at 328 ("The express, unambiguous language of subsection (2) of Colorado's premises liability statute evidences the General Assembly's intent to establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property."). Moreover, a contrary conclusion would almost certainly contravene the General Assembly's intent in passing the premises liability statute. If landowners were to assume common law duties to warn, for example, by

23

posting signs regarding known dangers, then, by complying with their duties to licensees and invitees, they would also incur liabilities to trespassers.  This result would be contrary to the specific dictates of the statute, which severely limit a landowner's liability to a trespasser to those "damages willfully or deliberately caused by the landowner."  Colo. Rev. Stat. Ann. § 13-21-115(3)(a) (West 2009).  Therefore, I conclude that Colorado's premises liability statute abrogates a landowner's potential common law duties to warn that arise out of the assumed duty doctrine.

Dr. Kumar may not predicate his negligence claim on the common law duty to warn of known dangers on real property, or on a similar assumed duty under the common law, because, after the enactment of the Colorado premises liability statute, neither duty exists.  Furthermore, even if the Court reads Dr. Kumar's complaint to implicate § 13-21-115's similar duty to warn licensees and invitees of known dangers, Dr. Kumar fares no better.

### 2. Premises Liability of Ski Area Operators

The Colorado General Assembly, in passing and amending the Act, established "a comprehensive and exclusive specification of the duties," *Vigil*, 103 P.3d at 328, that ski area operators owe to those injured on their property.  Therefore, the Act fully encompasses the field of ski area operator liability relative to the inherent dangers and risks of skiing.  By extension, the Act precludes claims such as Dr. Kumar's, which attempt to assert extrinsic duties not specifically contemplated in the Act.

As proof of this point, the Act states that "[n]otwithstanding any judicial decision or any other law or statute to the contrary . . . no skier may make *any* claim against or recover from *any* ski area operator for injury resulting from *any* of the inherent dangers

24

and risks of skiing."  Colo. Rev. Stat. Ann. § 33-44-112 (West 2009) (emphases added).

The word "any" generally is interpreted to mean "all" or "without limitation or exception."

*Patterson Recall Comm., Inc. v. Patterson*, 209 P.3d 1210, 219 (Colo. App. 2009); *see*

*Stamp*, 172 P.3d at 447 (interpreting "any" in § 33-44-113 of the Act to mean "all").

Similarly expansive language has been interpreted as a legislative attempt to

supersede all contrary law.  *See Vigil*, 103 P.3d at 328 ("By using the language 'any civil

action brought against a landowner by a person who alleges injury occurring while on

the real property of another,' the General Assembly indicated its intent to completely

occupy the field and supercede the existing law in the area."); *Van Waters & Rogers,*

*Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo. 1992).

In further support of the Court's conclusion, the very purpose of the Act is to alter

and define the duties and liabilities of ski area operators with respect to skiers.  *See*,

*e.g.*, Colo. Rev. Stat. Ann. § 33-44-102 (West 2009).  ("[T]he purpose of this article is to

supplement the passenger tramway safety provisions of part 7 of article 5 of title 25,

C.R.S.; to further define the legal responsibilities of ski area operators and their agents

and employees; to define the responsibilities of skiers using such ski areas; and to

define the rights and liabilities existing between the skier and the ski area operator and

between skiers."); *see also Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d

1202, 1212 (10th Cir. 2001).  The existence of a great many duties that are not

contemplated within the provisions of the Act would undermine these explicitly stated

purposes of the Act.

Finally, the Act describes in great detail what warning signs a ski area operator must post.  In fact, the majority of a ski area operator's legal responsibilities defined in the Act involve signage designed to apprise skiers of the rules and safety concerns on the mountain.  For example, one section of the Act dictates that particular signage must be placed on tramways.  *See* Colo. Rev. Stat. Ann. § 33-44-106 (West 2009).  Another section prescribes the warnings that must be made with regard to motorized vehicles used on the mountain by ski area operators.  *See* Colo. Rev. Stat. Ann. § 33-44-108 (West 2009).  Still another – the section which is most relevant to the present inquiry – discusses signs that inform skiers of the status or condition of particular terrain, whether by noting the terrain's difficulty, that it is closed or beyond ski area boundaries, or that it contains certain man-made structures.  *See* Colo. Rev. Stat. Ann. § 33-44-107 (West 2009).

A violation of the listed duties is the only source of liability contemplated under the Act with regard to injuries associated with the inherent dangers and risks of skiing.  *See* Colo. Rev. Stat. Ann. §§ 33-44-103(3.5) & 104(2) (West 2009).  More to the point, by specifically excluding violations of the Act's signage requirements from the definition of inherent dangers and risks, *see* Colo. Rev. Stat. Ann. § 33-44-103(3.5) (West 2009) the General Assembly signaled its intent to limit ski area operators' duties to warn.  *Cf. Vigil*, 103 P.3d at 327 (Colo. 2004) ("[W]hen the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others." (quoting *Lunsford v. W. States Life Ins.*, 908 P.2d 79, 84 (Colo. 1995))).

Nowhere in the Act does the General Assembly require that known dangers be marked.[7]  Therefore, there is an inherent conflict between the broad duty to warn invitees and licensees of known dangers found in the premises liability statute and the detailed duties regarding warnings through signage presented by the Act.  Pursuant to the Act itself, when such a conflict exists, the Act governs.[8]  *See* Colo. Rev. Stat. Ann. § 33-44-114 (West 2009) ("Insofar as any provision of law or statute is inconsistent with the provisions of this article, this article controls.").  As a consequence, individuals injured at ski areas due to an inherent danger or risk of skiing may not assert the duties

---

[7] In fact, as discussed above, the 2004 amendments to the Act intentionally removed a requirement that "danger areas" be "designated by a red exclamation point inside a yellow triangle with a red band around the triangle and the word 'Danger' printed beneath the emblem."  Colo. Rev. Stat. Ann. §§ 33-44-107(2)(d) (West 2003). The Court is unconvinced by Dr. Kumar's argument that portions of the legislative history surrounding the 2004 amendments to the Act indicate the General Assembly's intent to maintain such a requirement despite its deletion.  However, even if that "danger area" requirement was grafted back into the statute, it would not help Dr. Kumar.  In discussing the previous iteration of the Act, the Colorado Supreme Court explained that "[a] ski area operator . . . need not post warning signs concerning any danger areas that present 'inherent dangers and risks of skiing,' and no skier can recover from a ski area operator for injuries resulting from such dangers and risks." *Graven v. Vail Assocs.*, Inc., 909 P.2d 514, 518 (Colo. 1995).  Because Celebrity Cornice qualifies as an inherent danger or risk of skiing, Copper Mountain would have had no duty to warn of its presence.

[8] The presently operative premises liability statute became effective on April 20, 1990.  Section 33-44-112 of the Act became effective July 1, 1990.  Furthermore, while the premises liability statute addresses the liability of landowners generally, the Act deals with a specific subset of landowners, ski area operators.  As a result, to the extent that § 112 of the Act conflicts with the premises liability statute, § 112 would govern under standard interpretive doctrines.  *See* Colo. Rev. Stat. Ann. §§ 2-4-205 (West 2009) ("If the conflict between [two] provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail."); Colo. Rev. Stat. Ann. §§ 2-4-206 (West 2009) ("If statutes enacted at the same or different sessions of the general assembly are irreconcilable, the statute prevails which is latest in its effective date.").

contained in Colorado's premises liability statute.  Instead, they are limited to the relief provided in the Act itself.  Accordingly, Dr. Kumar may not assert a negligence claim against Copper Mountain based on common law duties to warn, including assumed duties, or on statutory duties to warn of known dangers.  Copper Mountain is entitled to judgment as a matter of law on Dr. Kumar's negligence claim asserting a duty to warn of known dangers.

### III.  CONCLUSION

Defendant Copper Mountain has met its initial burden at summary judgment by establishing that the undisputed material facts demonstrate fundamental flaws in plaintiff's only claim, that of negligence and negligence per se for the injuries he sustained on Celebrity Cornice.  Because Dr. Kumar has failed to identify a common law or statutory duty defendant Copper Mountain breached, he cannot succeed on his negligence claim.  *See Burchinal v. Gregory*, 586 P.2d 1012, 1014 (Colo. App. 1978) ("Where there is no duty, there can be no negligence.").  Therefore, because an essential element of Dr. Kumar's claim is lacking, defendant Copper Mountain is entitled to judgment as a matter of law and this case is properly dismissed. Accordingly, it is

**ORDERED** that defendant Copper Mountain, Inc.'s motion for summary judgment [Docket No. 32] is GRANTED and this case is dismissed with prejudice.  It is further

**ORDERED** that plaintiff's appeal [Docket No. 58] of the magistrate judge's order [Docket No. 55] and defendant Copper Mountain Inc.'s motions in limine [Docket Nos. 92, 93, 94] are DENIED as moot.  It is further

**ORDERED** that the clerk shall forthwith enter judgment in favor of defendant Copper Mountain, Inc. and against plaintiff Rajeev Kumar.  Defendant Copper Mountain, Inc. may have its costs by filing a bill of costs within eleven days of the date of this order.

DATED November 19, 2009.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge